**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cr-00220-002** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **GULED MOHAMED** | ) | |

**<u>MEMORANDUM</u>**

Before the court is the government's Motion for an Order of Forfeiture. (Doc. No. 678.)

The motion is supported by an initial supporting Memorandum (Doc. No. 679) and a supplemental

Memorandum (Doc. No. 735) that was filed following the sentencing hearing. The government

seeks a forfeiture money judgment in the amount of $200,000. (Doc. No. 735, at 1.) Defendant

Guled Mohamed has filed a Response in opposition to the Motion for Forfeiture (Doc. No. 758),

arguing that the government has not established by a preponderance of the evidence that forfeiture

in the amount of $200,000 is warranted. At most, he argues, the record supports forfeiture in the

amount of $30,000. (*Id.* at 6.) The government filed a Reply, reiterating its position that its request

for a money judgment in the amount of $200,000 is "reasonable based on the facts." (Doc. No.

771, at 2.)

For the reasons set forth herein, the court will grant the government's motion.

**I.      PROCEDURAL BACKGROUND**

The government filed a Second Superseding Indictment on November 7, 2018, charging

Guled Mohamed and others with a single count of engaging in a conspiracy to knowingly and

intentionally distribute and possess with intent to distribute heroin, fentanyl, methamphetamine,

and cocaine. (Doc. No. 405.) More specifically, the Second Superseding Indictment alleges that

the amount of drugs in the conspiracy attributable to the defendant is 400 grams or more of fentanyl and 500 grams or more of methamphetamine. (Doc. No. 405, at 2.) The Second Superseding Indictment also included Criminal Forfeiture allegations, providing notice to the defendants, including Mohamed, that, upon conviction, each defendant would be liable for forfeiting to the United States "any property constituting, or derived from, any proceeds the person obtained directly or indirectly as a result of said violation," including, but not limited to, a money judgment in an amount to be determined. (Doc. No. 405, at 3–4 (citing 21 U.S.C. § 853).)[1]

Shortly after the filing of the Second Superseding Indictment, Mohamed entered a plea of guilty, without a plea agreement. (Doc. Nos. 486, 488.) He was sentenced on May 30, 2019 to a prison term of 151 months. (Doc. No. 705.) The government filed its forfeiture motion on May 24, 2019, less than a week prior to sentencing. As discussed at the sentencing, and as noted in the Judgment, the court extended the time for the parties to brief the issue of forfeiture, which has now been completed.

## II.  LEGAL STANDARD

Criminal forfeiture is part of a defendant's sentence, to be imposed as provided by statute. *United States v. Hall*, 411 F.3d 651, 654 (6th Cir. 2005) (citing *Libretti v. United States*, 516 U.S. 29, 49 (1995)). The government may seek criminal forfeiture for violation of any federal statute "for which the civil or criminal forfeiture of property is authorized." 28 U.S.C. § 2461(c). By statute, any person convicted of a serious drug crime is subject to forfeiture. 21 U.S.C. § 853(a);

---

[1] Mohamed was also named in the original Indictment and first Superseding Indictment (Doc. Nos. 3, 119), filed on November 29, 2017 and December 13, 2017, respectively. He was arrested on December 4, 2017 in Minnesota, detained, and removed to the Middle District of Tennessee. (Doc. No. 69.)

*see also Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017) ("Forfeiture under § 853 applies to 'any person' convicted of certain serious drug crimes.").

If the government "include[s] notice of the forfeiture in the indictment or information," and "the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case" and in accordance with the procedures set forth in 21 U.S.C. § 853. 28 U.S.C. § 2461(c). *See also* Fed. R. Crim. P. 32.2(a) ("A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute.").

Under 21 U.S.C. § 853(a), any person convicted of a drug-related felony "shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation [and] any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." Section 853 also provides for the forfeiture of "substitute" property:

> [I]f any property described in subsection (a), as a result of any act or omission of the defendant—
>
> (A) cannot be located upon the exercise of due diligence;
>
> (B) has been transferred or sold to, or deposited with, a third party;
>
> (C) has been placed beyond the jurisdiction of the court;
>
> (D) has been substantially diminished in value; or
>
> (E) has been commingled with other property which cannot be divided without difficulty[—]
>
> [then] the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) . . . as applicable.

*Id.* § 853(p)(1)–(2).

To be entitled to forfeiture, the government must prove by a preponderance of the evidence that a nexus exists between the property at issue and the criminal offense. *See* Fed. R. Crim. P. 32.2(b)(1)(A); *United States v. Jones*, 502 F.3d 388, 391–92 (6th Cir. 2007). "The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

The statute does not explicitly authorize forfeiture money judgments. *See* 21 U.S.C. § 853(b) (defining the term "property" as either (1) "real property, including things growing on, affixed to, and found in land" or (2) "tangible and intangible personal property, including rights, privileges, interests, claims, and securities"). Nonetheless, "a majority of circuits . . . has coalesced around the view that money judgments are permissible under section 853." *United States v. Young*, 330 F. Supp. 3d 424, 429–30 (D.D.C. 2018) (citations omitted). The Sixth Circuit is clearly among these. *See, e.g.*, *United States v. Harrison*, No. 18-5176, 2018 WL 7435869, at *1–2 (6th Cir. Oct. 15, 2018) ("Where the government is unable to recover the actual property that is subject to forfeiture, the government can seek a money judgment against the defendant for an amount equal to the value of the property that constitutes the proceeds of the drug violation." (quoting *United States v. Bevelle*, 437 F. App'x 399, 407 (6th Cir. 2011) (citing 21 U.S.C. § 853(p))); *United States v. Hampton*, 732 F.3d 687, 691 (6th Cir. 2013) (citations omitted).

"Section 853(a)(1) limits forfeiture to property the defendant 'obtained . . . as the result of' the crime," whether directly or indirectly. *Honeycutt*, 137 S. Ct. at 1632. And the government "must prove forfeiture by a preponderance of the evidence." *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007).

## III.    DISCUSSION

In its original Memorandum in support of the Motion for an Order of Forfeiture, the government sought a money judgment in the amount of $883,497. (Doc. No. 679.) Now it seeks $200,000. (Doc. No. 735.) In support of its claim of entitlement to this sum, the government argues that "the total amount of the proceeds and property used to commit the conspiracy was $200,000." (*See* Doc. No. 735, at 2.) It also argues that the defendant must forfeit "any property constituting, or derived from, any proceeds the person obtained directly or indirectly as a result of said violation," under § 853(a)(1). (Doc. No. 735, at 3.)

The evidence to which the government points in support of this estimate includes transcripts of intercepted telephone calls between defendant Mohamed and co-defendant Filmon Mehtsentu. In one of these, the defendant appears to state that he himself had made $200,000 through drug trafficking: "I made like probably about 200, right at 200." (Doc. No. 735-1, at 3.)[2] In addition, Special Agent Matthew Passmore testified at the defendant's plea hearing about Mohamed's involvement in the drug conspiracy, as follows:

> The underlying investigation by agents of the Drug Enforcement Administration and the Bureau of Alcohol, Tobacco, Firearms and Explosives involved five Title III wiretaps during which the defendant and his co-conspirators were intercepted during September, October and November of 2017.
>
> During the course of these wire interceptions, agents learned that members of the drug trafficking organization under investigation trafficked controlled substances to the Middle District of Tennessee from Atlanta, Georgia, and elsewhere.
>
> The defendant was intercepted over Target Telephone 1, Target Telephone 2, Target Telephone 3, cell phones used by Filmon Mehtsentu, regarding the distribution of ice cream (methamphetamine) and food (heroin).
>
> The defendant was a source of supply of controlled substances to Mehtsentu. The defendant was based in Atlanta, but prior to the indictment fled to Minnesota after

---

[2] The court has also listened to the audio recordings of the intercepted telephone calls, on a CD manually filed by the government. (*See* Doc. Nos. 662, 676.)

he observed agents conducting surveillance on an USPS delivery that contained narcotics.

The defendant coordinated the shipment of drugs from Arizona to an address in Georgia and later shipped the drugs to the Middle District of Tennessee or provided them to Mehtsentu in person.

Mohamed would receive parcels of controlled substances at the residences of his co-conspirators. On October 2, 2017, agents executed a federal search warrant on a parcel sent from Arizona to a co-conspirator. The parcel contained approximately one kilogram of what agents suspected to be heroin. However, the DEA lab determined it was actually 990 grams of fentanyl. The defendant later acknowledged that his parcel [had] been intercepted by law enforcement. In a later conversation with Mehtsentu and the defendant, the defendant said, quote, I think, I think, I think what happened was they did a controlled delivery.

On Friday October 20, 2017, on a call over Target Telephone 3, the defendant told Mehtsentu, quote, the motherfucking ice cream, listen – the motherfucking ice cream will be here on Monday, bro, so.

On Monday October 23, 2017, agents identified two suspicious parcels sent to the defendant's co-conspirator['s] home. Agents conducted surveillance on the co-conspirator's home as the parcels were being delivered. Based on the intercepted calls, the defendant was outside the residence in a vehicle conducting counter-surveillance and observed the agents.

Following his observation of the agents, he told Mehtsentu, quote, let me just lay low, and I will just get my people to send it to you directly, bro, but listen, man, this shit here, this shit here is too risky famo. Like for now, you know what I'm saying, just, just, a motherfucker could wait like right after, you know what I'm saying, right after the holidays or like the holidays peak season in like the middle of November, then you can squeeze some items in, you know what I'm saying, but bro, it's too risky right now though.

The co-conspirator refused to accept those parcels and they were returned to the USPS. Agents ultimately obtained those parcels and found 2.232 kilograms of 95 percent pure methamphetamine in one parcel and 2.233 kilograms of 98 percent pure methamphetamine in a second parcel. That resulted in 4.309 kilograms of pure methamphetamine.

Following this call, the defendant began using other means of distribution other than the USPS. When Mehtsentu asked him, quote, so what, why how long we shut down for man, is it over with? The defendant replied, quote, it's over with. I ain't fucking with this shit, bro.

He told Mehtsentu to, quote, lay low and that he would, quote, get my people to send it directly, but listen man, this shit here, this shit here is too risky. In the same call he later explained why he was concerned because, quote, for every gram of

methylone (the ice cream), every gram is equivalent to 100 grams, that's how they charge you in the feds.

On November 3, 2017, the defendant called Mehtsentu and stated, quote, also, also, also, I think they drove a whole one up here for me, they actually bring it today. Mehtsentu responded, quote, oh, they is? The defendant replied, quote, the food (code for heroin). Yeah, yeah, yeah, yeah, yeah. Mehtsentu then stated, quote, they need to come on, bro. I got plays on that shit.

In a later conversation between Mehtsentu and the defendant, Mehtsentu was complaining about the loss of 18 ounces of methamphetamine. The defendant told Mehtsentu, quote, I got some coming, man. You know they already sent the driver, so you know he already on the road, bro. So as soon as he get here, I got you bro.

(Doc. No. 764, at 9–13.) Mohamed, in response to the court's questioning, agreed that Passmore had "accurately inform[ed] the Court about what [the defendant] did here." (Doc. No. 764, at 14.)

At sentencing, U.S. Postal Inspector Don Paxton testified about his interception of three parcels sent from Yuma, Arizona, destined for 3274 Fern Drive in Tucker, Georgia—the same three parcels referenced by Passmore. (Doc. No. 765, at 24–29, 31–35.) Paxton intercepted the first package around October 2, 2017, prior to delivery, by cross-referencing the IP address with that of an individual tracking another suspicious package that had previously been delivered to a post office box in Antioch, Tennessee. (*See id.* at 22–24.) That package, because it was intercepted, never arrived at its intended destination. The second and third parcels were shipped on October 23, 2017. Rather than immediately intercepting these packages, law enforcement officers conducted surveillance, while allowing the packages to be delivered. Although the packages were addressed to a "Jenifer" or "Jeniffer" Wade, no person by that name lived at that address. The two packages were actually delivered to a person named Jo Webb at the Fern Drive address, who is characterized as an unindicted co-conspirator. Webb delivered them to an apartment complex where, law enforcement believes, Mohamed's fiancée lived. (*Id.* at 34.) According to Paxton, the packages were ultimately returned to the post office with a statement that they did not belong to the individual to whom they were delivered and a request that they be returned to the sender. At

that point, Paxton recovered the packages and verified that they each contained over two kilograms of methamphetamine. (*Id.* at 35.)

Paxton also testified, based on his investigation of postal records, that six other unintercepted packages, collectively weighing 32.24 pounds, or 14.73 kilograms, had been sent from Yuma, Arizona between July 13 and October 6, 2017 and delivered to the Fern Drive address. (*Id.* at 37, 42.) Based on the ratio of the weight of the packaging to the weight of the drugs in the three intercepted packages, the government estimates that these unintercepted packages contained approximately 9.75 kilograms of drugs.

The government produced a witness at sentencing who testified that, in the fall of 2017, the "going rate for a kilogram of heroin" was $60,000. (Doc. No. 765, at 64.) In addition, the same witness testified that Mehtsentu was intercepted while speaking to another source of supply, not the defendant, stating that he would pay $4,500 for a pound of methamphetamine, which is equivalent to $10,000 for a kilogram. (*Id.*) Based on this evidence, the government posits that the value of the unintercepted packages was between $97,500 and $585,224, depending upon whether they contained fentanyl/heroin, methamphetamine, or some combination thereof.

Finally, the government also points out that, in the intercepted calls, the defendant admitted that he also received drugs sent by courier instead of by United States mail. (Doc. No. 735, at 7 (citing Doc. No. 735-1, at 4, Doc. No. 735-9, at 5).)

For sentencing purposes, the PSR holds the defendant responsible for the three intercepted packages plus one kilogram of heroin that his source was in the process of delivering to him, as Mohamed acknowledged in an intercepted telephone call on November 3, 2017. (PSR at 9.) Further, the PSR notes that documents in the possession of the U.S. Probation Office "reflect September 27, 2017, as the earliest concrete date that the defendant can be identified as being

involved in the instant offense. Absent additional information, this date will be considered the date his involvement in the instant offense commenced. . . ." (PSR at 7 n.3.)

In his Response to the government's forfeiture motion, the defendant argues that the government has not proven by a preponderance of the evidence facts that would justify forfeiture in the amount of $200,000. More specifically, he argues that:

(1) The PSR found the defendant responsible only for the one package of fentanyl and two packages of methamphetamine that the government recovered and the one pound of heroin that Mohamed referenced during an intercepted telephone call with Mehtsentu. The government actually intercepted the three packages, so, the defendant argues, he himself never "obtained" them or any proceeds derived from them, as required by 21 U.S.C. § 853(a). He argues that, as a result, the government is not entitled to a forfeiture judgment for the value of those items but, instead, only for the value of the one pound of heroin that was attributed to the defendant but never recovered by law enforcement. The defendant concedes that the value of that one pound of heroin, based on testimony presented by the government, is approximately $30,000.

(2) The PSR notes that September 27, 2017 is the earliest date by which the defendant can concretely be linked to the conspiracy, and the court accepted that date at the sentencing hearing. The defendant argues that, of the unintercepted packages sent from Yuma, Arizona to Tucker, Georgia between July 13, 2017 and October 6, 2017, only one was actually sent after September 27 and, therefore, that the government has not established by a preponderance of the evidence any basis for attributing the earlier shipments to the defendant.

(3) In addition, regarding all of the unintercepted packages, the defendant argues that the government has offered no proof of the defendant's involvement in, or receipt of, those packages or, assuming they did contain drugs, that the defendant obtained any proceeds from those

shipments. He further argues that the government is simply speculating that the packages contained drugs or any specific type or quantity of drugs.

(4) Finally, the defendant argues that the alleged admission in an intercepted telephone call that he "made like probably about 200, right at 200" does not establish by a preponderance of the evidence that he actually made $200,000 in proceeds as a result of his participation in the conspiracy charged in this case. He asserts, first, that the government did not authenticate the telephone call as actually capturing the defendant's voice. Even assuming that it was the defendant speaking, he points out that the government has offered no corroborating evidence to support its interpretation of the statement, such as bank records or an actual witness's interpretation of the statement. And, even if the court construes the statement as the defendant's bragging about drug proceeds, the defendant points out that there is no proof that such proceeds were derived from *this* conspiracy.

The court addresses each of these arguments, below.

### (1)    The Intercepted Packages

In its Reply, the government concedes that forfeiture of drug trafficking proceeds is "limited to property that the defendant himself actually acquired as a result of the crime," *Honeycutt*, 137 S. Ct. at 1635, and it does not actually respond to the defendant's argument that forfeiture of the value of the intercepted packages is unwarranted.

Clearly, the defendant never "obtained, directly or indirectly," the kilogram of fentanyl that was intercepted by the government before it was delivered to Mohamed's agent or co-conspirator. Regarding the two packages of methamphetamine, it appears that the defendant briefly gained control over these packages but returned them to the Post Office, where the government took control of them.

The statute provides for the forfeiture of "any property constituting, or derived from, any proceeds the person obtained" as a result of the conspiracy. Here, the actual property at issue was the drugs themselves, and the government effectively obtained the forfeiture of those items when they were rejected by the defendant or his agents. The defendant did not derive any monetary proceeds from the drugs, because he did not sell them. The court therefore agrees with the defendant that forfeiture in any amount related to the intercepted packages is not warranted.

(2)    **The Delivered Parcels**

The government presented no direct evidence of the defendant's involvement in the conspiracy prior to late September 2017. Rather, it asks the court to infer his previous involvement from the available circumstantial evidence—namely, that (1) numerous additional packages, similar to the three intercepted parcels, were mailed from July through late September 2017 from various addresses in Yuma, Arizona to the same Fern Drive address in Tucker, Georgia; (2) these packages, like the intercepted packages, more likely than not contained drugs; (3) the total ratio of the weight of drugs in each package to the weight of the packaging itself, was likely to have been similar to the ratio of the weight of drugs to the weight of the packaging in the intercepted parcels; and (4) the drugs themselves, based on the contents of the intercepted packaging, were more likely than not to have been some combination of fentanyl (or heroin) and methamphetamine.

The defendant objects to this evidence as mere speculation, but circumstantial evidence always requires some degree of speculation. The classic example of circumstantial evidence is that of witnessing a person walking into a building shaking off a wet umbrella and surmising that the it must be, or must have been, raining outside. One could come up with other explanations for the wet umbrella, but most people most of the time would put money on rain rather than, say, lawn sprinklers or a movie set with a rain simulator.

In light of the defendant's admission at the plea hearing of his involvement in the shipping of the three intercepted packages and the statement to Mehtsentu, discussed below, that he "made 200," the court finds that the circumstantial evidence presented here is sufficient to establish by a preponderance of the evidence that the defendant was involved in the conspiracy prior to late September 2017 and that he personally controlled, directed, and obtained the other six shipments, that the parcels contained drugs, and that the drugs weighed at least 9.75 kilograms.

If the court, conservatively, estimates that two kilograms of that total were heroin and the remainder was methamphetamine, the value represented by that quantity and proportion of drugs would be nearly $200,000: (2 x $60,000) + (7.75 x $10,000) = $197,500. Adding that figure to the $30,000 value of the pound of heroin that the defendant does not contest, yields a total of more than $200,000.

### (3)    The Defendant's Statement That He "Made 200"

The defendant argues that the statement that he "made 200" cannot reasonably be construed to establish, by a preponderance of the evidence, that he made $200,000 during the course of this conspiracy. The court agrees but finds that the statement constitutes additional circumstantial evidence corroborating the conclusion, above, that he netted at least $200,000 from his part in the conspiracy.

The statement, considered in context, strongly indicates that the defendant was reflecting on his role in the conspiracy and that he had made approximately $200,000 in it. Following the defendant's learning on October 23, 2017 that the government was conducting surveillance to see where the two packages mailed to "Jenifer Wade" were going, the defendant communicated to Mehtsentu, in an intercepted telephone call on October 25, 2017, that he wanted to step away from the conspiracy before he got caught. First he said, "Boy listen to me, its over with." (Doc. No. 659-

5, at 1.) When Mehtsentu demanded to know who he was going to get "the shit" from, Mohamed continued:

> Let me just lay low, and I will just get my people to send it to you directly, bro, but listen man, this shit here, this shit is too risky famo, like for now, you know what I am saying. . . .
>
> I'm just listen, just let me just lay low and you know what I'm saying we'll we can crank back up, just stay out of the way man . . .

(*Id.* at 1–2.)

A few days later, the defendant left Atlanta and began using a new name. In an intercepted telephone call on October 31, 2017, the defendant told Mehtsentu that the name Guled is "dead. . . . [T]hat name gonna be dead for a hot minute." (Doc. No. 735-1, at 2.) Later in the same conversation, he advised Mehtsentu that "you gotta have an exit plan," and he, himself, was apparently making his own, at least temporarily:

> That exit bruh. You know what I'm saying. Cause the thing about it, bruh, I made like probably about 200, right at 200. Out of that 200 that I made, all that shit went back into, what you call it . . . . I ain't got nothing but like three wrecks in my name, bruh. That's it. But what guess what? It's ready to be good in the next couple of weeks.

(*Id.* at 3.)

Certainly, if this were the only evidence in the record regarding what proceeds the defendant had actually obtained in the course of the conspiracy, the court would find that it did not satisfy the government's burden. Considered in the context of the record as a whole, the court finds that this statement further substantiates a conclusion that the defendant obtained at least $200,000 and is liable for forfeiture in that amount.

As for Mohamed's argument that the government did not authenticate the transcript and audio recording of the October 31, 2017 telephone conversation in which Mohamed told Mehtsentu that he made "right at 200," the Federal Rules of Evidence do not apply to sentencing

and forfeiture proceedings. Instead, the court may base its ruling on any "evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). Although the government did not authenticate the October 31 audio recording or transcript, there is no dispute that a Title III wiretap was authorized in this case and that the defendant was intercepted on numerous telephone calls with co-defendant Mehtsentu. Mohamed did not object to the authenticity of the intercepted calls discussed at the plea hearing by Agent Passmore, under oath. The telephone number on the transcript of the telephone calls discussed by Passmore is the same as that identified on the transcript of the October 31 call. Although it would have been easy, and certainly preferable, for the government to have submitted an affidavit attesting to the provenance and authenticity of the recorded calls and the transcripts, the court nonetheless finds that the transcripts and audio recordings submitted by the government to be both relevant and—in light of the totality of the circumstances—reliable. And, again, the defendant's statement in the October 31 call is not the sole basis for the court's finding that he personally obtained at least $200,000 during the course of the conspiracy to which he pleaded guilty.

## IV.     CONCLUSION

For the reasons forth herein, the court will grant the government's Motion for an Order of Forfeiture (Doc. No. 678) and issue an order of forfeiture consisting of a money judgment in the amount of $200,000.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge